1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD TERRAN FURNACE,

          Plaintiff,

   v.

SGT. K. NUCKLES, et al.,

          Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. C 09-6075 MMC (PR)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; STAYING ACTION AND REFERRING FOR SETTLEMENT PROCEEDINGS; DIRECTIONS TO CLERK**

**(Docket No. 31)**

19
20
21
22
23
24
25
26
27
28

     Before the Court is defendants' Motion to Dismiss and for Summary Judgment. Plaintiff has filed opposition, to which defendants have replied.  Having read and considered the papers submitted in support of and in opposition to the motion, the Court rules as follows.

## PROCEDURAL HISTORY

     On December 30, 2009, plaintiff, a California prisoner incarcerated at Corcoran State Prison ("CSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983, alleging therein, against twenty-one defendants, thirty causes of action arising from incidents occurring at Salinas Valley State Prison ("SVSP").  On July 10, 2010, plaintiff filed a Second Amended Complaint ("SAC"), the operative pleading in the above-titled action, after which the Court conducted an initial review and found plaintiff had stated

1    causes of action for: (1) retaliation (claims one through seven, ten, and twenty-one);

2    (2) conspiracy (claims six and fifteen); (3) denial of free speech (claims eight and eleven);

3    (4) interference with familial association (claim nine); (5) excessive force (claims thirteen,

4    sixteen through twenty, and twenty-two); (6) denial of equal protection (claim twelve);

5    (7) denial of due process (claims fourteen and twenty-four); (8) deliberate indifference to

6    serious medical needs (claim twenty-three); (9) state law violations (claims twenty-five

7    through twenty-nine); and (10) supervisory liability (claim thirty).  (See Order of Service,

8    filed Jan. 27, 2011.)

9         On April 26, 2011, defendants filed the instant motion to dismiss and for summary

10   judgment.  On March 4, 2013, following extensive motion practice primarily pertaining to

11   discovery, plaintiff filed his opposition, and, on March 13, 2013, defendants filed their reply.

**FACTUAL BACKGROUND**

13        At all times relevant to the above-titled action, plaintiff was an inmate at SVSP.

14   Earlier, in 2006, plaintiff had brought a separate action in federal district court, Furnace v.

15   Evans, C 06-4229 MMC, in which he alleged civil rights violations by various SVSP prison

16   officials and correctional officers.  As set forth below, plaintiff's initiation of that earlier

17   action forms the basis of plaintiff's claims in the instant action.

18   I.   Claims Arising in 2007

19        Plaintiff alleges the named defendants retaliated against him for filing C 06-4229

20   MMC by: (1) destroying plaintiff's quarterly package; (2) destroying plaintiff's personal

21   property during a search of his cell; and (3) making a false report in plaintiff's prison file that

22   plaintiff has been convicted of a sex crime.  (SAC at 5-7.)

23        A.   Quarterly Package Destruction and Cell Search

24        The Court begins with plaintiff's account.  According to plaintiff, the following events

25   occurred.

26        In January 2007, plaintiff's mother sent him a quarterly package.  (Pl. Decl. Supp.

27   Opp. Mot. Summ. J. ("Pl. Decl.") ¶6.)  Correctional Officer J.J. Rodriguez ("J.J.R.")

28   destroyed the quarterly package in retaliation for plaintiff's having filed C 06-4229 MMC.

**United States District Court**
For the Northern District of California

(SAC at 5.)[1]  After plaintiff filed an administrative grievance (No. SVSP-C-07-01746) against J.J.R. for the destruction of plaintiff's quarterly package, said defendant further retaliated against plaintiff by threatening to break plaintiff's jaw and by calling plaintiff a snitch and child molester in front of other inmates.  (SAC at 5.)  Thereafter, on July 24, 2007, in retaliation for plaintiff's refusal to withdraw appeal No. SVSP-C-07-01746, J.J.R., defendants Correctional Officer J. Celaya ("Celaya"), Correctional Officer J. Rodriguez ("Rodriguez"), and Sgt. J. Sensel ("Sensel") searched plaintiff's cell.  (Pl. Decl. ¶10.)  During the search, said defendants intentionally destroyed plaintiff's CD radio player and enclosed compact disc.  (SAC at 6.)

Defendants' account differs.  According to defendants, J.J.R. did not destroy plaintiff's quarterly package.  (Decl. of Jaime J. Rodriguez Supp. Mot. Summ. J. ("J.J.R. Decl.") ¶3.)  Rather, according to defendants, the following events occurred.

The quarterly package was delivered to the prison on February 6, 2007.  (See Decl. of E. Medina Supp. Mot. Summ. J. ("Medina Decl.") Exs. F, G.)  At that time, plaintiff was on a modified program, which prohibited inmates from receiving quarterly packages, and, consequently, the package was sent back to Receiving and Release ("R&R") to be returned to the sender.  (Id.)  No records exist, however, showing the package was received back by either R&R or the sender, and, given the absence of such documentation, the prison determined it appropriate to provide plaintiff with a replacement package at the earliest possible time.  (Id.)

Plaintiff was issued a replacement package on June 22, 2007 (id. Ex. G), but, due to an administrative error, plaintiff was not asked to sign for the replacement package (Decl. of J. Celaya Supp. Mot. Summ. J. ("Celaya Decl.") ¶3).  When plaintiff was later asked to sign for the package, he refused.  (Id.)

To confirm plaintiff did, in fact, receive the package, Celaya ordered Sensel, J.J.R., and Rodriguez to take everything out of plaintiff's cell and inventory it.  (Id. ¶5.)

---

[1] In the SAC, plaintiff refers to said defendant as "J.J.R.," apparently to distinguish him from defendant J. Rodriguez.

1    During that search, plaintiff's CD radio player fell to the ground and was broken beyond

2    repair.  (Decl. of J. Sensel Supp. Mot. Summ. J. ("Sensel Decl.") ¶4.)  Sensel prepared a

3    general chrono (CDC form 128B) regarding the inadvertent destruction of the CD radio

4    player and compact disc (id. ¶5 & Ex. 1), and plaintiff was informed he would be

5    compensated with an equivalent CD radio player and compact disc when they became

6    available (Celaya Decl. ¶7).  Thereafter, plaintiff was given a fully-functional replacement

7    radio.  (Medina Decl. Ex. I.)

8           B.     False Report of Sex Crimes

9           Plaintiff claims certain of the defendants further conspired to retaliate against him by

10   falsely reporting in his prison file that he had committed a sex crime.  (SAC at 7.)  A

11   September 2005 report from plaintiff's annual classification hearing lists plaintiff's prior

12   arrest history as follows:

13            ADW (Firearm), Burglary 1st, Murder 1st, Murder 2nd, Carry Loaded F'Arm,
             Possess Narcotic C/S for Sale, Murder, Assualt w/F'Arm on person, False
14           Imprisonment, induce False Testimony by force/ETC[.]

15   (Pl.'s Req. for Jud. Notice Supp. SAC ("Pl. RJN Supp. SAC") Ex. A.)[2]

16          A July 2007 report from plaintiff's annual classification hearing lists the same

17   offenses but includes several additional offenses, including two sex offenses, specifically,

18   "Rape: Victim Incapable of Consent" and "L&L (child under 14)."  (Pl. RJN Supp. SAC

19   Ex. B.)[3]  Plaintiff states that defendant Correctional Counselor J. Delaney ("Delaney") typed

20   the false information into the report (Pl. Decl. ¶19), and that defendant Appeals Coordinator

21   E. Medina ("Medina") created false reasons for screening out plaintiff's various inmate

22   appeals in which plaintiff contested the inaccurate reporting (SAC at 7; Pl. Decl. ¶64).

23          Defendants state the sex crimes were listed in plaintiff's prison file due to a computer

24   error (Decl. of J. Delaney Supp. Mot. Summ. J. ("Delaney Decl.") ¶8), and that upon

25   _____

26          [2] No objections thereto having been filed, and good cause appearing, the parties'
     respective requests for judicial notice are hereby GRANTED.  (See Doc. Nos. 32, 185, and
27   188.)

28          [3] The Court understands "L&L" to be an abbreviation for "Lewd & Lascivious Act."

4

1    discovery of the error, the crimes were immediately deleted from plaintiff's file (id. ¶9).

2    II.      Claims Arising on February 2, 2008

3           Plaintiff claims defendants continued to retaliate against him for filing the earlier civil

4    rights action, and for filing inmate appeals.  Plaintiff's remaining retaliation claims, as well

5    as his claims alleging excessive force, deliberate indifference to medical needs, denial of

6    equal protection, denial of familial association, and violation of due process, arise from

7    events that occurred on February 2, 2008.

8           A.      Family Visit

9           On February 2, 2008, plaintiff's family members traveled to SVSP to visit with

10   plaintiff and plaintiff's cousin, SVSP inmate Timothy L. Jones ("Jones").  (SAC at 8.)  Once

11   again, the parties' respective accounts diverge.

12                 1.      Defendants' Account

13          The Court begins with defendants' account.  According to defendants, the following

14   events occurred.

15          The family members who signed in to visit plaintiff were plaintiff's father and mother.

16   (Defs.' Mot. Summ. J. at 7; Delaney Decl. Ex. 1.)  Other family members signed in to visit

17   Jones.  (Delaney Decl. Ex. 2.)

18          SVSP has a policy regarding inmate visiting.  (Decl. of W. Rasley Supp. M. Summ. J.

19   ("Rasley Decl.") Ex. 1.)  The policy in effect in February 2008 provided:

20          Visiting with more than one (1) inmate at a time shall require that both inmates
            are approved to visit in the same visiting room and must be immediate family
21          members or visitor(s) has [sic] prior written approval from the Warden.

22   (Decl. G. Lopez Supp. Defs.' Reply ("Lopez Reply Decl."), Ex. A at 3 & ¶15.)[4]  The policy

23   also required all inmates to submit to an unclothed body search prior to entering and/or

24   _____

25          [4] "Immediate Family Members means legal spouse; registered domestic partner,
     natural parents; adoptive parents, if the adoption occurred and a family relationship existed
26   prior to the inmate's incarceration; step-parents or foster parents; grandparents; natural, step,
     or foster brothers or sisters; the inmate's natural and adoptive children; grandchildren; and
27   legal stepchildren of the inmate.  Aunts, uncles and cousins are not immediate family
     members unless a verified foster relationship exists."  15 C.C.R. § 3000 (2008).

28

United States District Court
For the Northern District of California

exiting the visiting room.  (Id. at 25, ¶23.)

It is unusual for visitors to cross-visit with inmates, and when it occurs, the correctional officers who work in the visiting rooms typically know before visiting hours which visitors and inmates have permission to cross-visit.  (Rasley Decl. ¶7; Decl. of D. Bittner Supp. Mot. Summ. J. ("Bittner Decl.") ¶6.)  Neither Furnace nor Jones had prior written authority from the Warden to cross-visit on February 2, 2008 (Rasley Decl. ¶8; Bittner Decl. ¶6), nor did their visitors (id.).

That day, while on duty in the visiting room, defendants Correctional Officer W. Rasley ("Rasley") and Correctional Officer D. Bittner ("Bittner") observed plaintiff and Jones cross-visiting with each other's visitors.  (Rasley Decl. ¶7; Bittner Decl. ¶6.)  There were no other inmates cross-visiting with unapproved visitors that day.  (Rasley Decl. ¶7.)

Because plaintiff and Jones did not have approval from the Warden to cross-visit, Rasley warned them that cross-visiting was not allowed, and that if they did not adhere to the policies and procedures for inmate visiting, their visits would be terminated.  (Rasley Decl. ¶9; Bittner Decl. ¶7.)  Jones and plaintiff complied and stopped cross-visiting.  (Id.)

Approximately thirty minutes later, Rasley and Bittner again observed Jones and plaintiff cross-visiting with each other's visitors.  (Rasley Decl. ¶10; Bittner Decl. ¶8.)  Rasley called Visiting Sergeant Watson and informed him of the situation.  (Rasley Decl. ¶10.)  Sergeant Watson instructed Rasley to terminate Jones's and plaintiff's visits for the day.  (Id.)

Rasley then asked the visitors to step outside the visiting room, and Rasley and Bittner escorted both inmates to the inmate visiting processing room, where Rasley informed plaintiff and Jones their visit was being terminated for the day because the procedures for visiting had been violated.  (Rasley Decl. ¶11; Bittner Decl. ¶8.)  Jones and plaintiff claimed they were not aware of the cross-visiting policy.  (Rasley Decl. ¶12; Bittner Decl. ¶9.)  Rasley and Bittner explained to them the rules for visiting, and pointed out that Jones and plaintiff had been warned earlier that day that cross-visiting was not allowed.  (Id.)  Rasley and Bittner informed the inmates that the complete rules for visiting would be provided to

them as soon as they agreed to an unclothed body search in accordance with prison policy. (Id.)

Jones and plaintiff refused to comply with Rasley's and Bittner's orders to submit to an unclothed body search. (Rasley Decl. ¶13; Bittner Decl. ¶10.) Jones and plaintiff were warned that if they refused to submit to an unclothed body search, they would be escorted back to their cells in handcuffs. (Id.) Jones and plaintiff refused to submit to handcuffs. (Id.)

As Rasley reached for Jones's arm to apply handcuffs, Jones advanced toward Rasley. (Rasley Decl. ¶13.) As Rasley took a step away from Jones and attempted to reach for his pepper spray, plaintiff, who had been standing behind Jones, stepped forward and hit Rasley on the left side of his face. (Id.) Rasley stepped back and plaintiff continued to advance toward him, punching him again in the face with a closed fist. (Id.) As plaintiff continued to advance toward Rasley, Rasley activated his personal alarm and then drew his baton, all the while ordering plaintiff to stop his actions and get down. (Id.) Plaintiff then grabbed Rasley, pulling him toward plaintiff in a bear hug. (Id. ¶14.) Plaintiff continued to hit Rasley with his closed right fist. (Id.) Rasley continued to verbally order plaintiff to get down. (Id.)

Defendants Sgt. M. Atchley ("Atchley") and Sgt. K. Nuckles ("Nuckles") responded to the alarm immediately. (Decl. of M. Atchley Supp. M. Summ. J. ("Atchley Decl.") ¶5; Decl. of K. Nuckles Supp. M. Summ. J. ("Nuckles Decl.") ¶5.) When said defendants arrived, they saw plaintiff hitting Rasley repeatedly in the face with his right fist. (Atchley Decl. ¶6; Nuckles Decl. ¶6.) Rasley was lying on his back underneath plaintiff, and his face was covered with blood. (Atchley Decl. ¶6.)

Atchley and Nuckles used their batons on plaintiff, and Rasley managed to get out from under plaintiff. (Atchley Decl. ¶¶7-10; Nuckles Decl. ¶¶6-12.) Plaintiff then began to hit and kick at Atchley and Nuckles. (Atchley Decl. ¶10; Nuckles Decl. ¶11.) Atchley ordered plaintiff to get down, but plaintiff continued toward Atchley and grabbed Atchley's mid-torso area with both hands. (Atchley Decl. ¶10.) Atchley attempted to hit plaintiff on the left side of his chest with the baton, but plaintiff hit Atchley's right hand, causing Atchley to loose his grip on the baton. (Id.) Plaintiff then began to hit Atchley in the chest and face.

United States District Court
For the Northern District of California

1   (Id.) Fearing for his life, Atchley hit plaintiff in the face three times. (Id.) Plaintiff then

2   tried to pull Atchley to the ground. (Id.) Atchley attempted to gain control of plaintiff using

3   his body weight, and as they both fell, plaintiff landed on his back, and plaintiff's head hit the

4   ground. (Id.) Atchley continually ordered plaintiff to stop resisting. (Id.)

5          Atchley was on top of plaintiff, holding plaintiff's upper torso with both hands

6   and attempting to maintain control of plaintiff. (Id. ¶11.) Plaintiff then rolled onto his

7   stomach in an attempt to knock Atchley off of him. (Id. ¶12.) Atchley grabbed plaintiff's

8   left arm, and plaintiff then grabbed Atchley's left hand and pulled Atchley's arms beneath his

9   body, trapping Atchley's left arm beneath him. (Id.) Atchley hit plaintiff three times on the

10   back of his head with his right forearm, causing plaintiff to release his grasp on Atchley's

11   arm. (Id. ¶13.)

12          Meanwhile, defendants Sgt. M. Kircher ("Kircher") and J.J.R. had responded to the

13   alarm. (Decl. of M. Kircher Supp. M. Summ. J. ("Kircher Decl.") ¶4; J.J.R. Decl. ¶9.)

14   Kircher was able to take control of plaintiff's legs by placing his feet between plaintiff's legs

15   and spreading plaintiff's legs apart. (Kircher Decl. ¶9.) Once plaintiff had been subdued,

16   J.J.R. assisted Nuckles by placing handcuffs on plaintiff while Atchley maintained control of

17   plaintiff's upper body. (Kircher Decl. ¶9; J.J.R. Decl. ¶11.)

18          Defendant Correctional Officer D. Ponce ("Ponce"), who also had responded to the

19   alarm, put leg restraints on plaintiff. (Decl. of O. Ponce Supp. M. Summ. J. ("Ponce Decl.")

20   ¶6.) Immediately after the leg restraints were secured, defendant Ponce left the area. (Id.)

21          After plaintiff and Jones were secured in restraints, both inmates were sent to the

22   Facility C Health Annex. (Nuckles Decl. ¶14; J.J.R. Decl. ¶13; Kircher Decl. ¶11.)

23          As a result of the February 2, 2008 incident, Rasley suffered numerous injuries to his

24   face, requiring nineteen stitches. (Rasley Decl. ¶16.) Rasley did not return to work for

25   approximately two weeks. (Id.) Bittner, who, during Rasley and Atchley's struggle with

26   plaintiff, was struggling with Jones, suffered a bite to his forehead and swollen eyes, and did

27   not return to work for approximately four weeks. (Bittner Decl. ¶¶12,13.) Atchley suffered a

28   strained elbow and wrist, and did not return to work for approximately one week. (Atchley

1    Decl. ¶15.)

2        Plaintiff was charged in the Monterey County Superior Court with a felony,

3    specifically, battery by a prisoner on Rasley and Atchley, in violation of California Penal

4    Code § 4501.5.  (Defs.' Req. for Jud. Notice Supp. Mot. Summ. J. ("Defs.' RJN") Ex. A

5    People v. Furnace, No. 08020074.)[5]  The case was tried to a jury, which found plaintiff guilty

6    of a lesser included offense of misdemeanor assault on Rasley, in violation of California

7    Penal Code § 240.  (Defs.' Supp. Req. for Jud. Notice Supp. Mot. Summ. J. ("Defs.' Supp.

8    RJN") Ex. C.)  The jury was unable to reach a verdict regarding the charged battery on

9    Atchley, and the court declared a mistrial as to that count.  (Id.)

10                    2.    Plaintiff's Account

11       Plaintiff's version of the events differs markedly.  According to plaintiff, the events

12   occurred as follows:

13       Family members traveled more than 600 miles to visit plaintiff and Jones on February

14   2, 2008.  (SAC at 8.)  A short time into the visit, Rasley approached the inmates and asked to

15   speak with them, escorted them into the strip-out room, and informed them the visit was

16   being terminated.  (SAC at 9.)  Neither Rasley nor Bittner gave the inmates any prior

17   warning that they were violating visiting rules.  (Pl. Decl. ¶36.)  Neither Rasley nor Bittner

18   checked the visitor passes to verify the relationships of the inmates to the visitors.  (Id.)

19       Plaintiff and Jones asked to see the visiting policy, and Rasley refused the request.

20   (Pl. Decl. ¶37.)  Plaintiff then asked to speak to a supervisor, at which point Rasley threw

21   plaintiff on the ground and began punching and hitting plaintiff.  (Id.)  Within seconds,

22   Atchley, Nuckles, Kircher, Ponce, J.J.R., Rodriguez, and defendant Correctional Officer J.

23   Mora ("Mora") appeared in the strip-out room as if they had been "lying in wait."  (SAC

24   ¶¶64, 142; Pl. Decl. ¶38.)  They placed plaintiff in handcuffs and leg irons and proceeded to

25   stomp, kick, punch, and use their batons on him.  (Id.)

26

27       [5] Additionally, charges were brought against Jones relating to the encounter with
     Rasley and Bittner.  (Defs.' RJN Ex. A.)  Plaintiff, as noted below, states Jones was acquitted
28   of all charges (Pl. Decl. ¶58), and defendants have not disputed plaintiff's statement as to
     such verdict.

During the beating, plaintiff was held face down on the ground.  (SAC ¶¶64, 66; Pl. Decl. ¶39.)  He suffered a broken wrist, two black eyes, a twisted ankle, head injuries, and facial injuries.  (Id.)

J.J.R., Rodriguez, and Mora then dragged plaintiff to the SVSP C Facility Medical Annex, continuing to beat him along the way.  (SAC ¶74; Pl. Decl. ¶39.)  Once there, said defendants rammed plaintiff's face into the wall of the holding cell seven or eight times, before tossing him in and locking the door.  (Id.)

Plaintiff asserts the termination of the visit had nothing to do with any rules violation but, rather, was a pretext to lure plaintiff into the strip-out room where defendants were waiting to assault him.  (SAC at 11.)  In support of such assertion, plaintiff alleges he and his visitors never received a visiting termination form as mandated by 15 C.C.R. § 3176.[6]  (Id.)  Plaintiff also points out that the attack occurred approximately two weeks after the Court denied a motion to dismiss brought by the defendants in C 06-4229 MMC (Pl. Decl. ¶41; Pl. Req. for Jud. Notice Supp. Opp. Mot. Summ. J. ("Pl. RJN") Ex. J.)

With respect to the injuries claimed to have been sustained by Rasley, Bittner, and Atchley, plaintiff contends defendants fabricated their incident reports and filed the criminal charges in Monterey County Superior Court to cover up their actions (Pl. Opp. Mot. Summ. J. At 5); plaintiff describes the results of the Monterey County criminal trial as follows:

> I went to trial on these fabricated charges in October of 2011.  A jury found me guilty of misdemeanor charge on Rasley, not guilty charge on Bittner, and hung on the charge against Atchley, 8 to 4 in favor of acquittal.  My cousin inmate Jones was also charged with this fabricated nonsense and tried with me in October 2011.  The jury acquitted him of all charges.

(Pl. Decl. ¶58.)

B.   Medical Care

Plaintiff claims SVSP medical staff defendants Nurse A. Butt ("Butt") and Nurse R. Lipps ("Lipps") intentionally refused to provide plaintiff with immediate medical treatment

_____

[6]  Pursuant to 15 C.C.R. § 3176(b), "[w]ritten notification shall be provided to the visitor when action is taken by the official in charge of visiting to deny, terminate or restrict a visit."

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    after he was escorted to the SVSP C Facility Medical Annex.  (SAC at ¶¶89-96.)  Defendants

2    have submitted a declaration stating plaintiff was escorted to the Facility C Medical Annex

3    shortly after the incident (Rodriguez Decl. ¶7), but provide no evidence as to the level of care

4    plaintiff was given.  Defendants have also provided a CDCR 837-B1 report showing

5    plaintiff's injuries were documented.  (Delaney Decl. Ex. 3.)  The report notes that plaintiff

6    had no serious injuries and was treated and released.  (Id.)

**DISCUSSION**

I.      Motion for Summary Judgment

        A.      Legal Standard

10          Summary judgment is proper where the pleadings, discovery, and affidavits show

11   there is "no genuine dispute as to any material fact and the movant is entitled to judgment as

12   a matter of law."  See Fed. R. Civ. P. 56(a).  Material facts are those that may affect the

13   outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

14   dispute as to a material fact is genuine if the evidence is such that a reasonable jury could

15   return a verdict for the nonmoving party.  See id.

16          A court shall grant summary judgment "against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on which

18   that party will bear the burden of proof at trial[,] . . . since a complete failure of proof

19   concerning an essential element of the nonmoving party's case necessarily renders all other

20   facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving

21   party bears the initial burden of identifying those portions of the record that demonstrate the

22   absence of a genuine issue of material fact.  Id.  The burden then shifts to the nonmoving

23   party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers

24   to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

25   genuine issue for trial.'"  See id. at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

26          For purposes of summary judgment, the court must view the evidence in the light most

27   favorable to the nonmoving party; if the evidence produced by the moving party conflicts

28   with evidence produced by the nonmoving party, the court must assume the truth of the

1  evidence submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158

2  (9th Cir. 1999).  The court's function on a summary judgment motion is not to make

3  credibility determinations or weigh conflicting evidence with respect to a disputed material

4  fact.  See T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

5  Cir. 1987).

6      A verified complaint may be used as an opposing affidavit under Rule 56, provided it

7  is based on personal knowledge and sets forth specific facts admissible in evidence.  See

8  Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's

9  verified complaint as opposing affidavit where, even though verification not in conformity

10 with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and

11 correct, and allegations were not based purely on information and belief but rather on

12 personal knowledge).[7]

13      B.    Analysis

14         1.    Excessive Force Claim: February 2, 2008 Incident

15      Plaintiff claims Rasley, Bittner, Atchley, Nuckles, Kircher, Ponce, Mora, J.J.R. and

16 Rodriguez used excessive force in the strip-out room on February 2, 2008, when they

17 unnecessarily beat plaintiff after plaintiff had complied with Rasley's orders.  Plaintiff claims

18 the beating occurred while defendants held him face-down on the ground in handcuffs and

19 leg irons.

20      "[W]henever prison officials stand accused of using excessive physical force in

21 violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . .

22 whether force was applied in a good-faith effort to maintain or restore discipline, or

23 maliciously and sadistically to cause harm."  Hudson v McMillian, 503 U.S. 1, 6-7 (1992).

24 In determining whether the use of force was for the purpose of maintaining or restoring

25 discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate

26 "the need for application of force, the relationship between that need and the amount of force

27

28      [7]  Plaintiff's SAC is verified and, in addition, he has submitted a sworn declaration
    with his opposition.

United States District Court
For the Northern District of California

used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  Id. at 7 (internal quotation and citation omitted).

It is not necessary that a prisoner have suffered significant injury in order to prevail on an Eighth Amendment claim for use of excessive force.  Hudson, 503 U.S. at 9. Nevertheless, the scope of the Eighth Amendment is not without limitation.  The Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Id. at 9-10 (internal quotation and citation omitted).  Although a prisoner may believe that his rights were violated, "[n]ot every push or shove . . . violates [his] constitutional rights."  Id. at 9 (internal quotation and citation omitted).

Here, defendants contend they are entitled to summary judgment because they used force in a good faith effort to maintain or restore discipline, and not maliciously or sadistically to cause harm.  In support of such contention, they submit declarations and incident reports prepared by Rasley, Bittner, and the responding correctional officers who witnessed the events in the strip-out room on February 2, 2008, all of which state plaintiff had to be physically subdued after he initiated an attack on Rasley.

As described above, however, plaintiff's version of the events is considerably different.  Plaintiff disclaims attacking Rasley or any other officer and states that defendants were lying in wait just outside the strip-out room, preparing to attack him upon Rasley's signal.  According to plaintiff, defendants' unnecessary and multiple blows inflicted after plaintiff was on the ground and unable to move show defendants used force maliciously and sadistically to cause plaintiff harm.  Additionally, plaintiff has submitted a sworn declaration by Jones, plaintiff's cousin and fellow inmate.  (Pl. Decl. Ex. R.)  As noted above, Jones was in the strip-out room with plaintiff on February 2, 2008 after both inmates had been escorted out of the visiting room.  Jones states he observed Rasley take plaintiff to the ground and smash plaintiff's face on the concrete after the inmates asked to speak to a supervisor.  (Id. ¶¶8, 9.)  Jones also states he observed several other officers punching, kneeing, and using their batons on plaintiff while plaintiff lay handcuffed and shackled in leg irons on the floor.

13

United States District Court
For the Northern District of California

1    (Id. ¶¶11-13.)

2      The discrepancy between the accounts proffered by plaintiff on the one hand and

3 defendants on the other cannot be resolved on summary judgment, and, viewing the evidence

4 in the light most favorable to plaintiff, a reasonable jury could conclude that the alleged use

5 of force, specifically, multiple blows after plaintiff had complied with orders and was on the

6 floor, was excessive, irrespective of whether plaintiff's injuries can be characterized as

7 serious. See Hudson, 502 U.S. at 9-10.

8      Even where a jury may find a constitutional violation if the plaintiff's account is

9 accepted, the defendant nevertheless may be entitled to qualified immunity if a reasonable

10 officer could have believed defendants' conduct was lawful. See Marquez v Gutierrez, 322

11 F.3d 689, 692-93 (9th Cir. 2003) (noting officers' claim of qualified immunity is not defeated

12 simply because a triable issue of fact exists as to whether their decision to use force was

13 malicious). In Marquez, for example, the plaintiff alleged that the defendant prison guard's

14 act of shooting him while he was standing passively in the vicinity of an assault on another

15 inmate constituted excessive force in violation of the Eighth Amendment, and the Ninth

16 Circuit found plaintiff's version of the facts showed an Eighth Amendment violation, see id.

17 at 692 (noting, "[t]o shoot a passive, unarmed inmate standing near a fight between other

18 inmates, none of whom was armed, when no inmate was in danger of great bodily harm,

19 would inflict unnecessary and wanton pain"), but nonetheless concluded the defendant was

20 entitled to qualified immunity because a reasonable officer, standing, as he was, in a tower

21 located 360 feet away from the disturbance, reasonably could perceive that the plaintiff and

22 another inmate were kicking a third inmate and threatening him with serious injury or death.

23 Id. at 691.

24      The same cannot be said here. Viewing the facts in the light most favorable to

25 plaintiff, it cannot be said that a reasonable officer in defendants' position would have

26 believed that delivering multiple blows to a prisoner who had complied with orders and was

27 shackled and on the floor constituted a good faith effort to restore discipline. See, e.g., Watts

28 v. McKinney, 394 F.3d 710, 712-13 (9th Cir. 2005) (finding prison guard could not

United States District Court
For the Northern District of California

1    reasonably believe he could lawfully kick prisoner who was on the ground and in handcuffs).

2    Moreover, a defendant's subjective belief as to the legality of his conduct is "essentially

3    irrelevant"; the issue is whether it was "objectively reasonable" to have believed the conduct

4    was lawful.  See Alford v Haner, 333 F.3d 972, 978-79 (9th Cir. 2003), reversed on other

5    grounds by Devenpeck v. Alford, 543 U.S. 146, 153-154 (2004).

6        While resolution of the factual issues may well relieve defendants of any liability in

7    this case, if plaintiff's version of the facts were to prevail at trial, a reasonable jury may

8    conclude that defendants inflicted unnecessary and wanton pain in violation of plaintiff's

9    constitutional rights.

10        Accordingly, defendants are not entitled to summary judgment on this claim.

11            2.    Retaliation Claim: February 2, 2008 Incident

12        Plaintiff claims defendants terminated his family visit on February 2, 2008 and

13   proceeded to beat him in the strip-out room as acts of retaliation for plaintiff's having filed

14   his prior civil rights action, C 06-4229 MMC, as well as various inmate grievances.

15        Within the prison context, a viable claim of First Amendment retaliation entails five

16   basic elements: "(1) An assertion that a state actor took some adverse action against an

17   inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled

18   the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

19   advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir.

20   2005).  The prisoner need not prove a total chilling of his First Amendment rights; "that his

21   First Amendment rights were chilled, though not necessarily silenced, is enough."  Rhodes,

22   408 F.3d at 569.

23        Here, plaintiff asserts there was an adverse action taken against him, in that his family

24   visit was terminated and defendants thereafter beat him.  Each such action is sufficient to

25   constitute adverse action.  See e.g., Vignolo v. Miller, 120 F.3d 1075, 1078 (9th Cir. 1997)

26   (holding discharge from prison job in retaliation for exercise of constitutional right

27   constitutes adverse action despite absence of constitutional right to prison job).  Plaintiff

28   further asserts these acts were not taken in response to any violation of prison rules on his

15

United States District Court
For the Northern District of California

part, but rather as retaliation for his having filed C 06-4229 MMC and inmate grievances. Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. See Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003). In this instance, plaintiff has shown the February 2, 2008 events occurred approximately two weeks after the Court dismissed a dispositive motion brought by defendants in C 06-4229 MMC. (Pl. RJN Ex. J.) Additionally, plaintiff has submitted evidence of inconsistency with previous actions, in that he states he had never before received a visiting rule infraction or had a visit terminated (Pl. Decl. ¶22) and he and his visitors never received a visiting termination form as mandated by 15 C.C.R. § 3176. Further, plaintiff has submitted evidence of threats made earlier by J.J.R. following plaintiff's filing of administrative appeal SVSP-C-07-01746. Specifically, plaintiff states:

> Defendant J.J.R. threatened to break plaintiff's jaw after [plaintiff] identif[ied] him in inmate appeal number SVSP-C-07-01746 for destroying his quarterly package of January 29th, 2007.

> After Appeal No. SVSP-C-07-01746 was filed, defendant J.J.R. would threaten plaintiff whenever he was under escort to or from library or medical, stating he was going to break his jaw and kick out his teeth inter alia, as soon as he could do it out of camera view.

> On several or more occasions, defendant J.J.R. called plaintiff a snitch and child molester for filing a 602 appeal in front of other prisoners.

(SAC at 5.)

> It is my belief that [J.J.R.] broke my wrist after I was placed in handcuffs. . . . He is the same officer who had been threatening to kick my teeth inter alia, as soon as he could do it where there were no cameras.

(Pl. Decl. ¶45.)[8]

As to the third of the above-referenced five elements, plaintiff has submitted evidence sufficient to show the asserted retaliation was because of protected conduct, specifically, his filing of a federal civil rights complaint and subsequent filing of an administrative complaint

---

[8] To the extent plaintiff bases his retaliation claim on such alleged threats, the claim, contrary to defendants' argument, is cognizable. See Brodheim v. Cry, 584 F.3d 1262, 1269-70 (9th Cir. 2009) (holding threat of transfer to another prison sufficient to support retaliation claim).

claiming retaliation.  Prisoners may not be retaliated against for exercising their "First Amendment right to pursue civil rights litigation in the courts."  See Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir. 1995).  The right of access to the courts extends to established prison grievance procedures.  See Austin v. Williams, 367 F.3d 1167, 1171 (9th Cir. 2004).

With respect to the fourth element, although plaintiff must show his First Amendment rights were "chilled," a prisoner, as noted, need not show a total chilling of his First Amendment rights in order to establish a retaliation claim.  See Rhodes, 408 F.3d at 568-69 (rejecting argument that inmate failed to state retaliation claim where, after alleged adverse action, plaintiff nonetheless had been able to file inmate grievances and lawsuit).  Here, as in Rhodes, plaintiff has alleged he was assaulted.  See id. at 568.  Such action is sufficient to chill plaintiff's First Amendment Rights, irrespective of whether plaintiff was actually inhibited.  See id. at 369.

Lastly, to satisfy the fifth element, plaintiff must show the asserted retaliatory action advanced no penological interest.  In that regard, the prisoner "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains."  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).  Here, plaintiff contends there was no reason to terminate his family visit because he was not violating visiting rules.[9] Defendants counter that plaintiff was "cross-visiting" with Jones's visitors in violation of Section 5.5(A)(15) of the inmate visiting procedures in effect in February 2008, which, as noted above, provided:

> Visiting with more than one (1) inmate at a time shall require that both inmates are approved to visit in the same visiting room and must be immediate family members or visitor(s) has [sic] prior written approval from the Warden.

(Lopez Reply Decl. Ex. A at 3 & ¶15.)

Defendants have not, however, provided the Court with a complete "approved visitor list."  (Delaney Decl. Ex. 1.)  For example, the approved visitor list for plaintiff, as submitted by defendants, does not include plaintiff's mother's name, but all parties agree that plaintiff's

---

[9] According to plaintiff, there is a video of the events that occurred in the visiting room but defendants have refused to produce it in discovery.  (Pl. Opp. Decl. ¶36.)

United States District Court
For the Northern District of California

mother had in fact been approved to visit that day, and had done so without incident.  (Defs.'
Mot. Summ. Jud. at 7; SAC at 9.)  Further, defendants have not identified in their motion, let
alone in any declaration or exhibit submitted in support thereof, the visitors who were
approved to visit plaintiff and the visitors who were approved to visit Jones,[10] nor have they
identified which visitors were considered "immediate family," who was "cross-visiting" with
whom, or the acts constituting the asserted "cross-visiting."  Indeed defendants admit they
never took any steps to verify whether any of the visitors were immediate family members.
(Pl. Decl. Ex. M at 6, Ex. N at 5.)[11]  Accordingly, the defendants have not demonstrated the
absence of a triable issue as to whether plaintiff was violating visiting procedures, and,
consequently, a triable issue remains as to whether the termination of the visit served any
penological purpose.

With respect to the events in the strip-out room, plaintiff argues he was complying
with orders and thus no penological interest existed for a use of force against him.
Defendants, on the other hand, contend they used force on plaintiff in order to restore
discipline.  As discussed above, a triable issue exists both as to the need for force and as to
whether any such force was used in retaliation for plaintiff's protected conduct.

Defendants contend they nonetheless are entitled to judgment, based on qualified
immunity.  It is clearly established law, however, such that it would be clear to a reasonable
officer, "that it is unlawful for the government to deliberately retaliate against a citizen for
exercising his right to comment on (and publicly) criticize government officials' actions and
his right to access the courts and administrative appeals process for redress of grievances."
CarePartners v. Lashway, 545 F.3 867, 883 (9th Cir. 2008).  If plaintiff's account is
accepted, a reasonable officer faced with the same circumstances as defendants could not

---

[10]  Jeffrey Furnace, for example, was signed in as Jones's visitor that day but is on
plaintiff's approved visitor list, where he is identified as plaintiff's brother.  (Delaney Decl.
Exs. 1, 2.)

[11]  Although defendants claim it was plaintiff's responsibility to provide to prison
personnel, in advance of the visit, the proper "paperwork" (Pl. Decl. Ex. L at 6), they point to
no policy supporting such a rule, nor have they endeavored to show plaintiff was given an
opportunity to submit such "paperwork."

1   have believed that terminating an inmate visit and physically assaulting that inmate in

2   retaliation for filing a civil rights action and staff complaints was lawful.  Consequently,

3   defendants are not entitled to qualified immunity on plaintiff's claim of retaliation relating to

4   the February 2, 2008 incident.

5         Accordingly, defendants are not entitled to summary judgment on this claim.

6         3.   Retaliation Claim: Quarterly Package & Destruction of CD Player

7         Plaintiff claims defendant J.J.R., in February 2007, destroyed his quarterly package in

8   retaliation for plaintiff's having filed C 06-4229 MMC.  As noted above, plaintiff filed an

9   administrative grievance (No. SVSP-C-07-01746) against J.J.R.  Additionally, plaintiff

10  claims that on July 24, 2007, in retaliation for plaintiff's refusal to withdraw the

11  administrative grievance about the quarterly package, defendants, including J.J.R., searched

12  plaintiff's cell and destroyed his CD radio player and enclosed compact disc.

13        The Court again finds plaintiff has satisfied the five elements of a First Amendment

14  retaliation claim.  First plaintiff identifies the destruction of his personal property as an

15  adverse action taken against him.  Second, plaintiff has again alleged and shown a retaliatory

16  motive in light of the timing of that action, specifically: (1) the quarterly package was

17  destroyed a little over a month after the Court issued the order of service in C 06-4229 MMC

18  and within approximately two weeks of service on the SVSP defendants in that action (see

19  C 06-4229 MMC, Dkt. Nos. 9, 16); and (2) defendants searched plaintiff's cell

20  approximately two weeks after plaintiff received a second level appeal response in No.

21  SVSP-C-07-01746 (Pl. Decl. Ex. B).  Further, plaintiff points out that Celaya, who

22  admittedly authorized the cell search, and Rodriguez, who participated in the cell search,

23  were both defendants in C 06-4229 MMC.  Finally, as set forth above, plaintiff has identified

24  threats made by J.J.R. in the aftermath of plaintiff's filing of SVSP-C-07-01746.

25        As to the third and fourth elements, plaintiff, as discussed above, has shown the

26  conduct for which he allegedly was retaliated against, i.e., his filing of complaints,

27  constituted protected conduct, and that defendants' actions had the potential to chill

28  plaintiff's exercise of his First Amendment rights.  See Rhodes, 408 F.3d at 569 (holding

destruction of inmate's property and assaults on inmate sufficient to chill inmate's First Amendment rights even if inmate thereafter filed grievances and a lawsuit).

As to the fifth element, the alleged destruction of plaintiff's quarterly package advanced no penological purpose, and, as noted, defendants have endeavored to show the package was not destroyed.  In that regard, as discussed above, defendants assert the package was sent back to R&R to be returned to the sender because plaintiff was on a modified program that precluded him from receiving packages.  Defendants' own documents, however, show R&R never received the package.  Specifically, a first level review of plaintiff's appeal on this issue states "R&R records show that the package was never received from the yard."  (Medina Decl. Ex. F.)  Further, defendants admit the sender never received the package back, and offer no evidence as to what actually happened to the package.  The absence in the record of any evidence consistent with defendants' explanation, coupled with plaintiff's evidence as to a retaliatory animus, creates a triable issue of fact as to whether J.J.R. intentionally destroyed the package as alleged.

Regarding the July 24, 2007 cell search, defendants claim plaintiff refused to sign for his replacement package, making it necessary to conduct an inventory to confirm he had received it, during which the CD player was accidentally damaged.  Plaintiff, however, has submitted evidence showing he did sign for the replacement package.  Specifically, plaintiff points to the second level appeal response in SVSP-C-07-01746, which states:

> The appellant was issued a replacement package on June 22, 2007 as compensation by Sergeant J. Mensing.  The appellant signed the Inmate Property Card as required.

(Pl. Decl. Ex. B.)  A triable issue thus exists as to whether the cell search served a penological purpose, and thus whether the damage to the CD player was in fact accidental.

With respect to qualified immunity, as discussed above, the law is clearly established that a government official cannot deliberately retaliate against a citizen for exercising his right to access the courts and administrative appeals process for redress of grievances.  See CarePartners, 545 F.3d at 883.  If plaintiff's account is accepted, a reasonable officer faced with the same circumstances as defendants could not have believed that destroying an

inmate's personal property in retaliation for his prior filing of administrative complaints and

a civil rights action was lawful.  Consequently, defendants are not entitled to qualified

immunity on plaintiff's retaliation claim, to the extent such claim is based on the alleged

February 2007 destruction of his quarterly package and July 2007 cell search.

Accordingly, defendants are not entitled to summary judgment on this claim.

### 4.   Retaliation: False Report of Sex Crimes

Plaintiff claims defendants falsely reported in his prison file that he had been

convicted of a sex crime, in retaliation for his having filed C 06-4229 MMC and No. SVSP-

C-07-01746.  As noted above, a September 2005 report from plaintiff's annual classification

hearing lists plaintiff's prior arrest history as follows:

> ADW (Firearm), Burglary 1st, Murder 1st, Murder 2nd, Carry Loaded F'Arm,
> Possess Narcotic C/S for Sale, Murder, Assualt w/F'Arm on person, False
> Imprisonment, induce False Testimony by force/ETC[.]

 (Pl. RJN Supp. SAC Ex. A.)

As further noted, a July 26, 2007 report prepared by Delaney and used at plaintiff's

annual classification hearing lists the same offenses but includes two sex offenses,

specifically, "Rape: Victim Incapable of Consent" and "L & L (child under 14)."  (Pl. RJN

Supp. SAC Ex. B.)

The Court again finds plaintiff has satisfied the five elements of a First Amendment

retaliation claim.  First, falsely reporting sex crimes committed either on a child or an adult

would constitute adverse action taken against a prisoner.  Second, plaintiff has shown a

retaliatory motive, in that the inaccurate report was prepared in or around July 2007, i.e., no

more than three months after plaintiff's protected activity in No. SVSP-C-07-01746.  (See

Medina Decl. Ex. B at 10 (listing filing date for SVSP-C-07-01746 as March 26, 2007).)

Further, as detailed above, plaintiff has identified threats made by J.J.R., which threats,

according to plaintiff, were made "after" his administrative appeal was filed (SAC at 5), and

included more than one instance wherein J.J.R. referred to plaintiff as a "child molester" in

front of other inmates.

Next, as discussed above, plaintiff has shown the conduct for which he allegedly was

United States District Court
For the Northern District of California

retaliated against, the filing of complaints, constituted protected conduct, and that

defendants' adverse acts had the potential to chill plaintiff's First Amendment rights.

As to the fifth element, plaintiff argues a false report advances no penological

purpose. Defendants do not argue to the contrary. Rather, they claim the inaccurate entry

was the result of a computer error. Specifically, Delaney states the following:

> On May 28, 2006, I prepared [plaintiff's] C-file for his annual review. During my review of [plaintiff's] file, I discovered a rap sheet dated July 10, 2003 that indicated two separate sex-related arrests and convictions. I reviewed all previous committee actions, noting that the convictions had not been addressed.
>
> On May 30, 2006, [plaintiff's] annual review was conducted by the Unit Classification Committee (UCC) in absentia. . . . After the hearing, I prepared the chrono indicating the information related on the rap sheet, and I ordered the arrest reports, court documents, and dispositions for the sex-related convictions.
>
> On June 27, 2006, [plaintiff's] C-file was returned to me so that I could request additional information from the courts relating to the sex-related crimes. In reviewing the rap sheet, I noticed a CDC identification number listed for the sex-related crimes. The CDC identification number was not [plaintiff's] identification number. I ordered an updated rap sheet for both CDC identification numbers, and I determined that an error had been made on [plaintiff's] 2003 rap sheet. Apparently, two rap sheets for two separate inmates ([plaintiff] and the inmate actually convicted of the sex-related crimes) had been inadvertently combined by the computer system prior to sending the information to [SVSP].
>
> I am informed and believe that the error on [plaintiff's] rap sheet has been corrected, and the sex-related crimes are no longer listed in [plaintiff's] C-file. I am informed and believe that the sex-related crimes in [plaintiff's] C-file were incorrectly placed there, and upon discovery, they were <u>immediately</u> deleted and [plaintiff] was informed that the sex-related crimes were removed from his C-file.

(Delaney Decl. ¶¶6-9 (emphasis added).)

Delaney's explanation, however, is not undisputed. Rather, plaintiff has submitted

evidence that his C-file was not "immediately" corrected after Delaney discovered the error.

In particular, as noted above, plaintiff's annual classification hearing report (CDCR Form

128G), dated July 26, 2007, i.e., over a year later, still listed the sex crimes (Pl. RJN Supp.

SAC Ex. B) and, as late as September 2007, Delaney denied plaintiff's CDC appeal, in which

plaintiff specifically identified the false sex crimes and asked they be removed from his file

(Pl. RJN Supp. SAC Ex. E). In support of such denial, Delaney stated: "You're [sic] 128g is

United States District Court
For the Northern District of California

1  accurate information provided by your C-file." (<u>Id.</u>)  Under such circumstances, a triable

2  issue exists as to the reason for the false report.

3       With respect to qualified immunity, again viewing the evidence in the light most

4  favorable to plaintiff, a reasonable officer could not have believed placing false sex crimes in

5  plaintiff's prison file in retaliation for plaintiff's prior civil rights action and staff complaints

6  was lawful.  Consequently, to the extent plaintiff's retaliation claim is based on the false

7  report, defendants are not entitled to qualified immunity.

8       Accordingly, defendants are not entitled to summary judgment on this claim.

9            5.   <u>Conspiracy</u>

10      Plaintiff claims defendants conspired to use excessive force and conspired to retaliate

11  against him for filing C 06-4229 MMC and inmate grievances.

12      To establish a conspiracy, a plaintiff must establish the existence of an agreement or

13  "meeting of the minds" to violate his constitutional rights, <u>Franklin v. Fox</u>, 312 F.3d 423, 441

14  (9th Cir. 2002), and that an "actual deprivation of his constitutional rights resulted from the

15  alleged conspiracy," <u>Hart v. Parks</u>, 450 F.3d 1059, 1071 (9th Cir. 2006) (internal quotation

16  and citation omitted).  Proof of conspiracy requires evidence showing the defendants

17  "intended to violate [the plaintiff's] constitutional rights."  <u>Hart</u>, 450 F.3d at 1069.  As

18  "[d]irect evidence of improper motive or an agreement among the parties to violate a

19  plaintiff's constitutional rights will only rarely be available[,] . . . it will almost always be

20  necessary to infer such agreements from circumstantial evidence or the existence of joint

21  action." <u>Mendocino Environmental Center v. Mendocino County</u>, 192 F.3d 1283, 1302 (9th

22  Cir. 1999).  Consequently, "an agreement need not be overt, and may be inferred on the basis

23  of circumstantial evidence such as the actions of the defendants." <u>Id.</u> at 1301.  Moreover,

24  "questions involving a [defendant's] . . . state of mind are generally factual issues

25   inappropriate for resolution by summary judgment." <u>Id.</u> at 1302 (internal quotation and

26  citation omitted).

27      Here, as discussed above, the evidence demonstrates a triable issue exists as to

28  plaintiff's claim of excessive force against the following nine defendants: Rasley, Bittner,

United States District Court
For the Northern District of California

Atchley, Nuckles, Ponce, Kircher, Mora, Rodriguez, and J.J.R.  As further discussed, there is a triable issue as to whether these defendants as well as defendant Celaya, by directing a destructive cell search, and defendant Delaney, by making a false report, engaged in such conduct in retaliation for plaintiff's protected activity.  Viewing the evidence in the light most favorable to plaintiff, it would not be unreasonable for a jury to infer a "meeting of the minds" among said defendants to punish plaintiff for his earlier complaints.

Accordingly, summary judgment will be denied with respect to plaintiff's claim for conspiracy against defendants Rasley, Bittner, Atchley, Nuckles, Ponce, Kircher, Mora, Rodriguez, J.J.R., Celaya, and Delaney[12]

### 6.  Familial Association

Plaintiff claims defendants violated his First Amendment, due process, and equal protection rights when they improperly terminated his family visit on February 2, 2008.

#### a.  First Amendment Challenge

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822 (1974). When faced with a First Amendment challenge to a prison visitation policy, a court need not determine the scope of the asserted constitutional right if it finds that the challenged policy is reasonably related to legitimate penological interests, in which case the policy must be upheld.  Overton v. Bazzetta, 539 U.S. 126, 131-32 (2003) (applying Turner v. Safley, 482 U.S. 78, 89 (1987)).

The Supreme Court has held that the Constitution protects "certain kinds of highly personal relationships."  Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984). Additionally, outside the prison context, the Supreme Court has discussed a right to maintain certain familial relationships, including association among members of an immediate family

---

[12]  The Court also rejects defendants' alternative argument that plaintiff has failed to meet the heightened pleading standard for conspiracy.  As discussed above, a plaintiff may rely on direct or circumstantial evidence to support a claim of conspiracy.  Mendocino Environmental Center, 192 F.3d at 1302.  Here, the facts alleged in the SAC are sufficient to meet that standard.

United States District Court
For the Northern District of California

and association between grandchildren and grandparents.  See Moore v. East Cleveland, 431 U.S. 494 (1977) (plurality opinion); Meyer v. Nebraska, 262 U.S. 390 (1923).  Although the Supreme Court has not determined the scope of any associational rights retained by prisoners,  the Supreme Court has "not [held] . . . that any right to intimate association is altogether terminated by incarceration."  See Overton v. Bazzetta, 539 U.S. 126, 131 (2003).

As discussed above, defendants contend the termination at issue was reasonably related to a penological interest in maintaining order and prison security, and specifically, that they were acting pursuant to an SVSP operating procedure prohibiting cross-visiting.  As discussed above, however, defendants' evidence is subject to challenge and evidence sufficient to raise a triable issue has been raised by plaintiff.

Accordingly, defendants are not entitled to summary judgment on this claim.

b. Due Process Challenge

Plaintiff also raises a due process challenge based on the termination of the visit. Interests that are procedurally protected by the Due Process Clause may arise from two sources – the Due Process Clause itself and laws enacted by the states.  See Meachum v. Fano, 427 U.S. 215, 223-27 (1976).

Changes in prison conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law.  See Sandin v. Conner, 515 U.S. 472, 484 (1995) (citing Vitek v. Jones, 445 U.S. 480, 493 (1980) (addressing transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-22 (1990) (addressing involuntary administration of psychotropic drugs)).  A state may not impose such changes without complying with the minimum requirements of procedural due process.  See id. at 484.  The denial of a family visit does not give rise to a protected liberty interest.  See Kentucky Dep't. of Corr. v. Thompson, 490 U.S. 454, 461 (1989) ("The denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause.") (internal quotation and citation omitted); Gerber v. Hickman, 291 F.3d 617, 621 (9th Cir.2001) ("[I]t is well-settled that

25

prisoners have no constitutional right while incarcerated to contact visits or conjugal visits.")

Additionally, a deprivation that is less severe or more closely related to the expected term of confinement may constitute a deprivation of a procedurally protected liberty interest, provided that: (1) state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation, i.e. give the inmate a kind of right to avoid it, and (2) the liberty in question is one of "real substance." See id. at 477-87.

Because California has created regulations from which a protected interest could arise, the Court must consider whether the regulations creating the right plaintiff asserts here do in fact narrowly restrict the power of prison officials to deny inmates visitation, and whether the deprivation suffered is one of "real substance." See Sandin, 515 U.S. at 477-87.  A liberty interest of "real substance" generally is one that guarantees freedom from restraints that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," id. at 484, or from state action that "will inevitably affect the duration of [a] sentence," id. at 487. "Sandin requires a factual comparison between [the] conditions" of a prisoner's former status and his new status, "examining the hardship caused by the [] challenged action in relation to the basic conditions of life as a prisoner." Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003).  The condition plaintiff challenges here, specifically, termination of a visit on one occasion, does not constitute the type of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" contemplated by Sandin.

Accordingly, defendants are entitled to summary judgment on this claim.

### c. Equal Protection Challenge

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).  To state a claim for relief under the Equal Protection Clause, "a plaintiff must show that the defendant acted with an intent or purpose to discriminate against

1    him based upon his membership in a protected class." Serrano v. Francis, 345 F.3d 1071,

2    1081-82 (9th Cir. 2003). Classifications based on "inherently suspect distinctions" include

3    "race, religion, [and] alienage." See City of New Orleans v. Dukes, 427 U.S. 297, 303

4    (1976).

5          In this case, plaintiff alleges Rasley and Bittner violated his equal protection rights

6    because they terminated plaintiff's family visit on February 2, 2008, and did not terminate

7    other inmates' visits that day. (SAC at 21.) Such evidence is insufficient to demonstrate

8    plaintiff's membership in a protected class, see Hampton v. Hobbs, 106 F.3d 1281, 1286 (6th

9    Cir. 1997) (holding prisoners do not constitute protected class for equal protection purposes),

10   nor does plaintiff allege any facts showing any of the defendants acted with an intent or

11   purpose to discriminate against plaintiff based on his membership in a protected class.

12         Accordingly, defendants are entitled to summary judgment on this claim.

13                 7.    Supervisor Liability

14         Plaintiff claims defendants G.A. Neotti ("Neotti"), S. Hubbard ("Hubbard"), J. Ponder

15   ("Ponder"), and M. Evans ("Evans") are liable as supervisors, for failure to train and

16   supervise their subordinates who were responsible for violating plaintiff's rights. (SAC at

17   13, 15, 29-30.)

18         "'A defendant may be held liable as a supervisor under § 1983 if there exists either

19   (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

20   connection between the supervisor's wrongful conduct and the constitutional violation.'"

21   Henry A. v. Willden, 678 F.3d 991, 1003-04 (9th Cir. 2012) (quoting Starr v. Baca, 652 F.3d

22   1202, 1207 (9th Cir. 2011)). A supervisor cannot be liable based merely on "knowledge and

23   acquiescence" in a subordinate's unconstitutional conduct. Ashcroft v. Iqbal, 556 U.S. 662,

24   677 (2009). Rather, "a plaintiff must plead that each Government-official defendant, through

25   the official's own individual actions, has violated the Constitution." Id. at 676.

26         Here, plaintiff has failed to come forward with specific facts to show the involvement

27   of any of the supervisory defendants in the alleged deprivations. The conclusory allegations

28   in plaintiff's complaint are not sufficient to show said defendants participated through their

United States District Court
For the Northern District of California

"own individual actions" in the alleged deprivation of plaintiff's rights.  See Iqbal, 556 U.S. at 676.  In particular, plaintiff fails to produce evidence showing the supervisory defendants personally retaliated against plaintiff or that they ever issued an order, directive, or policy under which other officers were allowed to retaliate against plaintiff.

Accordingly, defendants Neotti, Hubbard, Ponder, and Evans are entitled to summary judgment on this claim.

### 8.   Official Capacity Claims

Plaintiff sues all defendants in both their individual and official capacities.  It is well established that a claim for damages against a state official in his official capacity is barred by the Eleventh Amendment.  See Regents of the University of California v. Doe, 519 U.S. 425, 429 (1997); see also Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71 (1989) (holding "neither a state nor its officials acting in their official capacities" may be sued under section 1983).

Accordingly, defendants are entitled to summary judgment on these claims.

### 9.   Individual Defendants Medina and Warren

The only allegations against defendants Medina and L. Warren ("Warren") relate to their alleged failures to process and/or investigate plaintiff's inmate appeals.  (SAC at 5, 6, 7.)  There is no constitutional right, however, to a prison administrative appeal or grievance system.  Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988).  Consequently, an incorrect decision on an administrative appeal or a failure to handle it in a particular way does not amount to a violation of plaintiff's constitutional rights.  See id.

Accordingly, defendants Medina and Warren are entitled to summary judgment.

### 10.   Individual Defendant Mojica

The only reference to defendant R. Mojica ("Mojica") in the SAC is as follows: "Upon information and belief, defendant Mojica filed a known false report of the February 2, 2008 incident based upon defendant Atchley's known false reports."  (SAC at 12.)  The SAC contains no additional allegations as to Mojica, nor has plaintiff submitted any evidence against Mojica, in support of either the SAC or his opposition to summary judgment.

1  Plaintiff's single, conclusory allegation against Mojica is insufficient to raise a triable issue

2  as to said defendant's liability.

3       Accordingly, defendant Mojica is entitled to summary judgment.

4  II.   Motion to Dismiss

5       In addition to moving for summary judgment, defendants argue that all or parts of the

6  SAC are subject to dismissal, on the grounds that: (1) the SAC violates Federal Rules of

7  Civil Procedure 18(a) and 20(a); (2) plaintiff failed to comply with California's Tort Claims

8  Act; and (3) plaintiff failed to exhaust available administrative remedies.

9       A.    Federal Rules of Civil Procedure 18(a) and 20(a)

10       Defendants argue the SAC violates Federal Rules of Civil Procedure 18(a) and 20(a)

11  because it improperly joins claims and defendants.  Under Rule 20, a plaintiff may join any

12  persons as defendants if: (1) any right to relief asserted against the defendants "aris[es] out of

13  the same transaction, occurrence, or series of transactions or occurrences"; and (2) there is at

14  least one question of law or fact common to all the defendants.  Fed. R. Civ. P. 20(a);

15  Coughlin v. Rogers, 130 F.3d 1348, 1351 (9th Cir. 1997).  Once a defendant is properly

16  joined under Rule 20, the plaintiff may join, "as independent or alternative claims," as many

17  claims as he has against that defendant, irrespective of whether those additional claims also

18  satisfy Rule 20.  See Fed. R. Civ. P. 18(a); Intercon Research Assoc., Ltd. v. Dresser Indus.

19  Inc., 696 F.2d 53, 57 (7th Cir. 1982) ("[J]oinder of claims under Rule 18 becomes relevant

20  only after the requirements of Rule 20 relating to joinder of parties has been met with respect

21  to the party against whom the claim is sought to be asserted; the threshold question, then, is

22  whether joinder of [a defendant] as a party was proper under Rule 20(a).").

23       In his SAC, plaintiff alleges prison staff retaliated against him for filing a prior civil

24  rights action, and that the retaliation continued after he filed inmate grievances regarding the

25  initial acts of retaliation.  In support thereof, plaintiff describes two instances of alleged

26  retaliatory conduct occurring in 2007, which he claims occurred because of his filing an

27  earlier civil rights action and, as to one such instance, an administrative grievance.  Plaintiff's

28  excessive force claims and additional retaliation claims arising from the incident on

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   February 2, 2008 likewise are based on his filing of that earlier civil rights action as well as

2   his filing an administrative grievance based on said alleged retaliation.  Liberally construed,

3   plaintiff's allegations describe a pattern of retaliatory events based on his exercise of his First

4   Amendment rights.  Cf. Coughlin, 130 F.3d at 1350.  Consequently, liberally construed,

5   plaintiff's allegations can be said to arise out of the same "transaction, occurrence, or series

6   of transactions or occurrences" and, additionally, present common questions of both fact and

7   law.  See Fed. R. Civ. P. 20.

8        Accordingly, defendants are not entitled to dismissal of any claims on grounds of

9   improper joinder.

10       B.    State Tort Claims

11       In his SAC, plaintiff raises five state law tort claims over which this Court may

12   exercise supplemental jurisdiction.  Defendants argue the claims must be dismissed because

13   plaintiff failed to comply with California's Tort Claims Act, see Cal. Gov. Code §§ 900 et

14   seq., which provides the prerequisites for the filing of a lawsuit alleging tort claims against

15   employees and agencies of the State of California.  Under the Tort Claims Act, all claims for

16   money or damages against the pertinent public entity must be presented to the Victim

17   Compensation and Government Claims Board ("the Board").  Cal. Gov. Code §§ 905, 905.2.

18   Absent a properly filed claim, no action may be brought against the public entity.  Id.

19   § 945.4.  Further, a cause of action against a public employee for injury resulting from an act

20   or omission in the scope of his or her employment is barred if an action against the

21   employing public entity is barred.  Fisher v. Pickens, 225 Cal. App. 3d 708, 718 (1990).

22       As to the five torts alleged here, the record shows the Board "Received" plaintiff's tort

23   claim on October 8, 2008 (Defs.' RJN Ex. B) and thereafter sent plaintiff a letter, dated

24   December 26, 2008, requesting plaintiff provide additional information, specifically,

25   plaintiff's original signature on the claim, (id.)  Thereafter, on or about December 31, 2008,

26   plaintiff sent a second tort claim form to the Board, asserting the same torts.  The claim was

27   "Received" on January 9, 2009, after which the Board sent plaintiff a letter, dated April 7,

28   2009, again requesting plaintiff provide an original signature on the claim.  (Id.)  According

1   to defendants, plaintiff never provided the requested signature.  (Mot. Summ. J. at 16.)

2        In his opposition, plaintiff asserts: "Defendants herein deliberately interfered with this

3   claim by failing to timely return it to plaintiff[;] as of today's date, the Government Claims

4   Board has not contacted plaintiff regarding his claim."  (Opp. at 7.)  Plaintiff admits,

5   however, that he received the Board's December 26, 2008 and April 7, 2009 letters

6   requesting additional information.  (Pl. Decl. ¶55 & Ex. AD.)  Plaintiff does not argue, let

7   alone show, he provided the requested information or did anything further to pursue his

8   claims before the Board.  Nor does he assert or show he was in any manner prevented from

9   doing so.  Plaintiff's state law claims thus are barred under California's Tort Claims Act.  See

10  Cal. Gov. Code § 945.4.

11       Accordingly, plaintiff's state law claims will be dismissed.

12       C.    Failure to Exhaust Administrative Remedies

13       Defendants move to dismiss part of plaintiff's excessive force claim as well as his

14  deliberate indifference to serious medical needs claim and false sex crimes claim on the

15  ground that plaintiff failed to exhaust his administrative remedies.

16       The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to

17  provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C.

18  § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other

19  correctional facility until such administrative remedies as are available are exhausted."  42

20  U.S.C. § 1997e(a).  Although previously within the discretion of the district court, exhaustion

21  in prisoner cases covered by § 1997e(a) is now mandatory.  Porter v. Nussle, 534 U.S. 516,

22  524 (2002).  The PLRA exhaustion requirement requires "proper exhaustion" of all available

23  administrative remedies.  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  Moreover, those

24  remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'"

25  Porter, 534 U.S. at 524 (citation omitted).  Even where the prisoner seeks relief not available

26  in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.  Id.;

27  Booth v. Churner, 532 U.S. 731, 741 (2001).  Exhaustion is a prerequisite to all inmate

28  lawsuits pertaining to prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong.  <u>Porter</u>, 534 U.S. at 532.

Nonexhaustion under § 1997e(a) is an affirmative defense, and is properly brought in an "unenumerated Rule 12(b) motion rather than [in] a motion for summary judgment." <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003).  In deciding a motion to dismiss for failure to exhaust administrative remedies under § 1997e(a), the court may look beyond the pleadings and decide disputed issues of fact.  <u>Id.</u> at 1119-20.  If the court concludes that the prisoner has not exhausted the jail's or prison's administrative process, the proper remedy is dismissal without prejudice.  <u>Id.</u>

The California Department of Corrections and Rehabilitation ("CDCR") provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare."  15 C.C.R. § 3084.1(a).[13]  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  <u>See id.</u> § 3084.1(e).  In order to exhaust available administrative remedies within said system, a prisoner must submit his complaint on CDCR Form 602 and proceed through several levels of appeal: (1) informal level grievance filed directly with any correctional staff member, (2) first formal level appeal filed with one of the institution's appeal coordinators, (3) second formal level appeal filed with the institution head or designee, and (4) third formal level appeal filed with the CDCR director or designee.  <u>Id.</u> § 3084.5; <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1264-65 (9th Cir. 2009); <u>Barry v. Ratelle</u>, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  Compliance with said procedure satisfies the administrative remedies exhaustion requirement under § 1997e(a).  <u>Barry</u>, 985 F. Supp. at 1237-38.

---

[13]  The regulations pertaining to the inmate appeals process were amended December 17, 2010.  The regulations cited here are those that were in effect at the time plaintiff submitted his inmate appeals.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1.   "Second" Excessive Force Claim

Defendants have submitted copies of prison records showing Appeal No. SVSP-I-08-00589 is the only grievance based on the February 2, 2008 incident that was appealed by plaintiff to the Director's Level.  (Medina Decl. ¶8 & Ex. C.; Decl. D. Foston ("Foston Decl.") ¶7 & Exs. A-B.)  On February 2, 2008, plaintiff submitted his CDC 602 inmate appeal form, stating the following:

> On 2-2-08 appellant was assaulted and battered by SVSP C Facility staff in the visiting area.  Appellant believes he was singled out for intimidation and retaliation because of his ongoing jailhouse lawyering activities, in Case No. E. Furnace v. M.S. Evans, et al., 4229 MMC (PR) U.S.D.C. ND Cal.  Upon information and belief defendant Knuckles orchestrated the assault on plaintiff with other presently unknown staff members.

(Medina Decl. Ex. C.)

Defendants characterize plaintiff's excessive force claim as arising from two separate incidents: (1) the alleged actions of the above-referenced group of defendants in the strip-out room after the termination of plaintiff's visit; and (2) the alleged actions of defendants J.J.R., Rodriguez, and Mora, who removed plaintiff from the strip-out room and allegedly dragged him to the Medical Annex holding cell.  Defendants argue that because the grievance did not mention the "second" excessive force incident, i.e., the events occurring en route to the Medical Annex, plaintiff failed to exhaust his "second" excessive force claim. (See Mot. at 20.)

The exhaustion requirement of the PLRA is intended to serve a number of purposes, including providing an opportunity for corrections officials to address complaints internally, deterring frivolous lawsuits, and creating an administrative record allowing courts to evaluate the relative merits of claims.  See Porter, 534 U.S. at 525.  "The primary purpose of a grievance," however, "is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."  Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).

"[A] prison's own grievance process, not the PLRA, determines how detailed a grievance must be to satisfy the PLRA exhaustion requirement." Id.  Under the Code of Regulations, an inmate is required to "describe the specific issue under appeal and the relief

United States District Court
For the Northern District of California

requested." See 15 C.C.R. § 3084.2.  The version of § 3084.2 in effect when plaintiff filed

his administrative appeal was worded even more broadly, instructing the inmate "to describe

the problem and action requested." See 15 C.C.R. § 3084.2 (amended 2011).  Where "a

prison's grievance procedures are silent or incomplete as to factual specificity," as is the case

here, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress

is sought." See Morton v. Hall, 599 F.3d 942, 946 (9th Cir. 2010) (internal quotation and

citation omitted).  It "need not contain every fact necessary to prove each element of an

eventual legal claim." Griffin, 557 F.3d at 1120.

Here, the administrative appeal at issue provided prison officials with notice that

plaintiff had been assaulted on February 2, 2008.  Beginning at the first level of the

administrative grievance procedure, plaintiff made clear he was asserting defendant Nuckles,

along with other staff members, committed an assault upon him, the location of which, given

the space limitations of the form provided, was not specified, let alone limited to the strip-out

room.  (Medina Decl. Ex. C.)  Moreover, the Director's Level decision, described  plaintiff's

claim as alleging that he was assaulted in the strip-out area and thereafter staff "dragged and

carried . . . to a holding cell where they rammed his face and head into a wall several times

and left him without medical treatment from 1230 hours to 1930 hours." (Foston Decl. Ex.

B.)  Nothing in the grievance as submitted or understood by those reviewing it suggests

plaintiff was limiting his complaint to events that happened exclusively in the strip-out area,

and defendants provide no authority for splitting the excessive force claim based upon the

fact that the assault allegedly occurred in more than one room.

In sum, rather than constituting separate and distinct claims, the allegations in the

SAC describe a beating that began in the strip-out area and continued en route to the Medical

Annex, thus comprising a single, extended assault about which plaintiff notified corrections

officials in his administrative appeal.  Consequently, plaintiff's single administrative appeal

suffices for purposes of exhaustion.

Accordingly, defendants' motion to dismiss plaintiff's "second" excessive force claim

will be denied.

34

2.   Medical Indifference Claim

Defendants argue that because plaintiff's CDC 602 inmate appeal did not mention his medical indifference claim against Butt and Lipps, such claim was not properly exhausted. As noted above, however, the Director's Level decision described plaintiff's grievance as a claim that staff "dragged and carried him to a holding cell where they rammed his face and head into a wall several times and left him without medical treatment from 1230 hours to 1930 hours." (Foston Decl. Ex. B (emphasis added).)  The Director's Level decision makes clear that plaintiff's grievance alerted prison officials to his medical indifference claim. Although defendants argue plaintiff improperly expanded the scope of his grievance too late in the appeals process, they cite to no authority for such proposition.  Moreover, as plaintiff correctly points out, his claim was never screened out on such ground, nor was he otherwise notified that his claim was not in proper form.  Rather, all of plaintiff's claims arising out of the February 2, 2008 events clearly were processed at the Director's Level and denied on the ground that the matter had already been referred to the Office of Internal Affairs for investigation.  (Id.)

Accordingly, defendants' motion to dismiss plaintiff's claim for deliberate indifference to medical needs will be denied.

3.   False Report of Sex Crimes

Defendants argue plaintiff failed to exhaust his claims pertaining to the entry of a sex crimes conviction in his prison file.  According to defendants, plaintiff filed an April 8, 2008 grievance (Appeal No. SVSP-08-01722) requesting removal of said false report.  (Medina Decl. Ex. E.)  The appeal was partially granted at the first level of review and returned to plaintiff on May 8, 2008.  (Id.)  Plaintiff did not pursue the appeal any further.  (Id.)

As noted above, however, plaintiff submitted an inmate appeal on the same issue in 2007, following his Unit Classification Committee Hearing.  Specifically, plaintiff submitted a CDC 602 inmate appeal form on September 4, 2007, asking that "false information be removed from [his] file."  (Pl. RJN Supp. SAC Ex. E.)  In their motion, defendants make no mention of such earlier appeal, leaving the Court unable to determine whether the earlier

United States District Court
For the Northern District of California

1   appeal properly exhausted plaintiff's claims relating to the false reporting of sex crimes in his

2   prison file.  As noted, nonexhaustion is an affirmative defense, i.e., "defendants have the

3   burden of raising and proving the absence of exhaustion."  See Wyatt, 315 F.3d at 1119

4   (holding "PLRA does not impose pleading requirement" as to exhaustion).

5       Accordingly, defendants' motion to dismiss plaintiff's claims alleging false sex crimes

6   reporting will be denied.

**CONCLUSION**

8       For the foregoing reasons, the Court orders as follows:

9       1.  Defendants' motion for summary judgment is hereby GRANTED IN PART and

10  DENIED IN PART as follows:

11          a.  Summary judgment is GRANTED in favor of defendants Neotti, Hubbard,

12  Ponder, Evans, Medina, Warren, and Mojica on all claims.

13          b.  Summary judgment is GRANTED in favor of all defendants with respect to

14  plaintiff's: (1) official capacity claims; (2) due process claim; and (3) equal protection claim.

15          c.  Summary judgment is DENIED with respect to plaintiff's claims of:

16  (1) excessive force as against defendants Rasley, Bittner, Atchley, Nuckles, Ponce, Kircher,

17  Mora, Rodriguez, and J.J.R.; (2) retaliation as against defendants Rasley, Bittner, Atchley,

18  Nuckles, Ponce, Kircher, Mora, J.J.R., Rodriguez, Celaya, and Delaney; (3) conspiracy as

19  against defendants Rasley, Bittner, Atchley, Nuckles, Ponce, Kircher, Mora, J.J.R.,

20  Rodriguez, Celaya, and Delaney; and (4) denial of familial association in violation of the

21  First Amendment as against defendants Rasley and Bittner.

22      2.  Defendants' motion to dismiss is hereby GRANTED IN PART and DENIED IN

23  PART as follows:

24          a.  Defendants' motion to dismiss for failure to comply with Federal Rules of

25  Civil Procedure 18(a) and 20(a) is DENIED.

26          b.  Defendants' motion to dismiss plaintiff's state law claims is GRANTED.

27          c.  Defendants' motion to dismiss for failure to properly exhaust available

28  administrative remedies before filing suit is DENIED.

3.  The case is hereby REFERRED to Magistrate Judge Nandor Vadas for settlement proceedings on plaintiff's claims against the remaining defendants.  Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Vadas's calendar will permit.  Magistrate Judge Vadas shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.

The Clerk is directed to serve Magistrate Judge Vadas with a copy of this order and to notify Magistrate Judge Vadas that a copy of the court file can be retrieved from the court's electronic filing database (ECF).

5.  The Clerk is further directed to: (1) terminate Neotti, Hubbard, Ponder, Evans, Medina, Warren, and Mojica as defendants on the court docket; and (2) correct the spelling of the name of defendant Nuckles on the docket by substituting "Nuckles" for "Knuckles."

6.  In view of the referral, further proceedings in this case are hereby STAYED.  If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates Docket No. 31.

IT IS SO ORDERED.

DATED:  May 10, 2013

MAXINE M. CHESNEY
United States District Judge